1
2
3
4
5
6

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

7
8
9
10
11
12

ANGEL LANDEROS and
AMELIA VILLALBA,

Plaintiff(s),

v.

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, et al.,

Defendant(s).

Case No. 2:14-CV-1525 JCM (CWH)

ORDER

13

14
15
16
17

Presently before the court is defendants Las Vegas Metropolitan Police Department ("LVMPD"), Sheriff Douglas Gillespie, Det. Scott Thomas, Ofc. Joseph Parra and Ofc. Clyde Villanueva's motion for summary judgment.[1]  (ECF No. 28).  Plaintiffs Angel Landeros and Amelia Villalba's filed a response (ECF No. 33), and defendants filed a reply (ECF No. 34).

18
19
20
21

As an initial matter, plaintiffs' response indicates that those parties do not oppose the dismissal of Villalba's 28 U.S.C. § 1983 claim against Thomas and further "do not oppose dismissing [plaintiffs'] claims against Sheriff Gillespie."  (ECF No. 33 at 2).  Accordingly, the same shall be the order of the court.

22

I.    Introduction

23
24
25
26
27

According to defendants, Robert Torres "was a violent criminal wanted for attempted murder with the use of a deadly weapon and battery domestic violence with the use of a deadly weapon."  (ECF No. 28 at 2).  Subsequently, LVMPD's Problem Solving Unit discussed how to find Torres with the Repeat Offender Program; Parra, Villanueva, and Thomas were members of

28

---

[1]  Thomas, Parra, and Villanueva, collectively, will be referred to as "officer defendants."

James C. Mahan
U.S. District Judge

these units. (*Id.*). The officers then "staked out the Bel Aire Apartments located at 4124 Pennwood in Las Vegas, Nevada as a possible hiding location for Torres." (*Id.* at 5). On February 8, 2013, Parra and Villanueva were conducting surveillance behind those apartments and knew that Thomas was also surveilling nearby. (*Id.*). Reportedly, "[t]he officers were in plainclothes but each had a tactical vest that clearly identified them as police officers." (*Id.* at 6).

Also on February 8, 2013, Landeros and Villalba arrived at the Bel Aire Apartment Complex at 4124 Pennwood Avenue in Las Vegas, Nevada to sell a 1997 Honda Accord to Torres. (*Id.*). Plaintiffs were about to enter the vehicle with Torres for a test drive when Parra "yelled 'Metro police, Metro police, get your hands in the air.'" (*Id.* at 6). Torres was reportedly located on the driver's rear side of the trunk at this time, and Parra allegedly was 15 feet away from Torres at the time of the incident. (*Id.*).

Landeros began to kneel about five seconds after hearing Parra's order and heard a gunshot at that time. (*Id.*). Landeros "noticed that his arm was moist," and fell to the ground while hearing additional shots. (*Id.* at 7). From the ground, plaintiff could see Torres collapse after being shot and drop a gun. (*Id.*). Ultimately, it appears that this wound "also caused: (1) left T7 rib fracture; (2) left lung laceration; (3) left chest pneumothorax; (4) left upper extremity bullet wound; (5) left thoracostomy; and (6) ongoing back pain." (*Id.* at 9).

Villalba reportedly heard someone shout "hands up" and hid behind the car after "hear[ing] shots coming from the officers' direction." (*Id.*). She could not see whether Mr. Torres had a gun, though Landeros stated that he did. (ECF No. 28-1 at 36) After the commotion had subsided, she walked to a sidewalk and realized "that her ankle had been grazed by a bullet." (ECF No. 28 at 7). Medical personnel concluded that she suffered "a superficial wound about 4 cm long on her left ankle. The ankle was wrapped with gauze and [Villalba] was given Silvadene cream. She received no further treatment." (*Id.* at 10).

"Parra ordered Torres to put his hands in the air and get down on the ground when he was within 15 feet of Torres." (*Id.* at 7). Parra asserts that Torres then drew a firearm and shot at Parra, who then responded with one shot before ducking behind a pony wall. (*Id.*) (stating that the shots

James C. Mahan
U.S. District Judge

were "almost simultaneous[]"). Parra heard additional shots and then broke cover when the noise subsided to "approach[] and handcuff[] Torres." (*Id.*).

Villanueva had accompanied Parra to make contact with Torres. (*Id.*). He states that he made eye contact with Torres, watched Torres draw a weapon, and later lost balance adjusting to Torres's movements. (*Id.*). He did not see Parra or Thomas fire, although he saw Thomas running into the scene from a different direction. (*Id.*). Villanueva did not discharge his firearm. (*Id.*).

"Thomas was at the east end of the apartment wall when he saw Torres reach into his pocket and pull out a gun." (*Id.* at 8). Thomas started running at Torres and began to fire at him when Torres moved further to the back of the vehicle. (*Id.*). In all, Thomas fired six shots. (*Id.*). Torres was killed as a result of the incident. (*Id.*).

LVMPD's homicide unit later probed the incident. (*Id.*). The investigation concluded that Parra's single shot hit "Landeros in the upper left arm," one of Thomas's rounds grazed Villalba's ankle, and four of Thomas's bullets hit Torres. (*Id.*). Lead investigator Clifford Mogg determined that plaintiffs' injuries resulted from accidental hits, produced by "Torres' attempt to resist arrest with a weapon and firing a shot from that weapon as officers were trying to take him into custody." (ECF No. 28 at 9); *see also* (ECF No. 28-4 at 8).

On November 19, 2014, plaintiffs filed their first amended complaint, asserting violations of constitutional rights and state law. (ECF No. 6). First, plaintiffs assert violations of the Fourth and Fourteenth Amendments of the United States Constitution against Parra, Villanueva, Thomas, and Doe defendants pursuant to 42 U.S.C. § 1983, to wit: "unreasonable seizure," "excessive and unreasonable force," "unlawful deadly force," and "reckless, deliberately indifferent, and conscience shocking deadly force." (*Id.* at 5). Second, plaintiffs assert a *Monell* claim against LVMPD, Sheriff Gillespie, and Doe defendants pursuant to 42 U.S.C. § 1983 for a variety of allegations involving polices regarding the use of force. (*Id.*). Third, plaintiffs assert a negligence claim against all defendants. (*Id.*). Finally, plaintiffs allege assault and battery claims against all defendants. (*Id.*).

. . .

. . .

**James C. Mahan**
**U.S. District Judge**

- 3 -

## II.      Legal Standard

The Federal Rules of Civil Procedure allow summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

For purposes of summary judgment, disputed factual issues should be construed in favor of the non-moving party. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990). However, to be entitled to a denial of summary judgment, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." *Id.*

In determining summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). Moreover, "[i]n such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Id.*

By contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the non-moving party's case; or (2) by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the non-moving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the

James C. Mahan
U.S. District Judge

- 4 -

1    opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient

2    that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

3    versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626,

4    630 (9th Cir. 1987).

5           The Ninth Circuit has held that information contained in an inadmissible form may still be

6    considered for summary judgment if the information itself would be admissible at trial.  *Fraser v.*

7    *Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (citing *Block v. City of Los Angeles*, 253 F.3d 410,

8    418-19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to

9    produce evidence in a form that would be admissible at trial, as long as the party satisfies the

10   requirements of Federal Rules of Civil Procedure 56.")).

11          **III.    Discussion**

12                 *a.   Qualified immunity*

13          When a plaintiff brings a claim under 42 U.S.C. § 1983, government officials sued in their

14   individual capacities may raise the affirmative defense of qualified immunity.  *See Spoklie v.*

15   *Montana,* 411 F.3d 1051, 1060 (9th Cir. 2005).  "Qualified immunity balances two important

16   interests—the need to hold public officials accountable when they exercise power irresponsibly

17   and the need to shield officials from harassment, distraction, and liability when they perform their

18   duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Indeed, "[q]ualified

19   immunity attaches when an official's conduct 'does not violate clearly established statutory or

20   constitutional rights of which a reasonable person would have known.'"  *White v. Pauly*, 137 S.

21   Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).

22          The doctrine protects government officials performing discretionary functions from

23   liability for civil damages as long as their conduct does not violate "clearly established statutory

24   or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,

25   457 U.S. 800, 818 (1982).  "The principles of qualified immunity shield an officer from personal

26   liability when an officer reasonably believes that his or her conduct complies with the law."

27   *Pearson*, 555 U.S. at 244.  Qualified immunity may apply even if the defendant makes a mistake

28   of law or acts based upon a mistake of fact. *Id.* at 231.

James C. Mahan
U.S. District Judge
                                                    - 5 -

Deciding whether an officer is entitled to qualified immunity is a two-step inquiry. *Id.* at 232. First, the court assesses whether the plaintiff has alleged or shown a violation of a constitutional right. *Id.* Second, the court decides whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Id.* The Supreme Court has instructed that district judges may use their discretion when deciding which qualified immunity prong to address first based on the circumstances of the case at issue. *See id.* at 236.

The second prong of the qualified immunity test requires a court to determine whether the right plaintiff claims was violated was "clearly established." *See id.* "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The dispositive question is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

Further, "clearly established law" may "not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011)).[2] Indeed, "[w]ithout that 'fair notice,' an officer is entitled to qualified immunity." *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1777 (2015).

Defendants request that the court consider whether clearly established law exists that would effectively put an officer on notice that "firing in self-defense at a lethal threat violated the Fourth Amendment or Fourteenth Amendment due process clause," with the accidental result of hitting bystanders, produces a violation of those bystanders' Fourth and Fourteenth Amendment rights. (ECF No. 28 at 19); *see also Sheehan*, 135 S. Ct. at 1777; *Pearson*, 555 U.S. at 236.

However, there is a genuine dispute of material fact as to whether Torres had drawn his weapon before shots were fired. In his deposition, Landeros states that he realized that he had been shot, then fell to the ground, and *subsequently watched from the ground* as Torres drew his

---

[2] It should be noted that the Court, in *al-Kidd*, explicitly noted that it "ha[d] repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." 563 U.S. 731, 742 (2011) (citation omitted).

James C. Mahan
U.S. District Judge

own firearm.  (ECF No. 28-1 at 15).  For the purposes of this motion, this deposition testimony must be treated as the true account of the events at issue.  *See Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1277 (9th Cir. 2017).  Accordingly, this court considers it to be true at this juncture that Torres's firearm was not drawn at the time that Landeros was shot.  *See id.*; *see also* (ECF No. 28-1).  Because this testimony also indicates that Torres was shot while pulling his weapon out of his pocket, the court is bound to adopt the inference most positive to plaintiffs' position: that Torres's firearm might not have been visible at the time that Thomas discharged his weapon.  *See Mayes*, 846 F.3d at 1277 ("Inferences must also be drawn in the light most favorable to the nonmoving party." (quoting *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987))); *see also* (ECF No. 28-1, 28-2).

Having made this deduction, this court finds that there is a genuine dispute whether plaintiffs' Fourth Amendment rights were violated by the officer defendants' use of force in the course of seizing defendants because it is axiomatic that a police officer may not use unreasonable lethal force to seize an individual.  *See, e.g.*, *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

Having highlighted Landeros's conflicting testimony, this court notes that much of defendants' motion is a nonstarter.  In fact, the motion is briefed under a fundamentally different foundation of facts.  *See* (ECF No. 28).  Defendants do not adequately discuss "the reasonableness requirement of the Fourth Amendment" and premise their Fourteenth Amendment defense on the presently-unconsidered assertion that "upon approach, the suspect pulled a weapon and fired in the direction of Ofc. Parra. Therefore, Ofc. Parra (and eventually Det. Thomas), shot for legitimate law enforcement purposes (self-defense)."  *Garner*, 471 U.S. at 7; (ECF No. 28 at 17).  Accordingly, defendants have failed their initial burden under summary judgment as to plaintiffs' § 1983 claims.  *C.A.R. Transp. Brokerage Co.*, 213 F.3d at 480.

### b.  Monell *claim*

The principal framework governing municipal liability in § 1983 actions was established in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  Under *Monell*, municipal liability must be based upon the enforcement of a municipal policy or custom, not upon the mere employment of a constitutional tortfeasor.  *Id.* at 691.  Therefore, in order for liability to attach, four conditions must

**James C. Mahan**
**U.S. District Judge**

be satisfied: "(1) that [the plaintiff] possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996).

"To prevent municipal liability . . . from collapsing into respondeat superior liability," federal courts must apply "rigorous standards of culpability and causation" in order to "ensure that the municipality is not held liable solely for the actions of its employees." *Board of Cnty. Comm. of Bryan City v. Brown*, 520 U.S. 397, 405, 410 (1997). Thus, a municipality will only be liable when the "execution of a government's policy or custom . . . inflicts the injury . . . ." *Monell*, 463 U.S. at 694.

"Proof of random acts or isolated events" does not fit within *Monell*'s meaning of custom. *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443 (9th Cir. 1989), *overruled on other grounds*, *Bull v. City & Cnty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010). Indeed, "[o]nly if a plaintiff shows that his injury resulted from a 'permanent and well-settled' practice may liability attach for injury resulting from a local government custom." *Id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 168 (1970))).

It is well settled in the Ninth Circuit that a plaintiff generally cannot establish a *de facto* policy with a single constitutional violation. *See, e.g.*, *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). Instead, a plaintiff's theory must be founded upon practices of "sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *see also McDade v. West*, 223 F.3d 1135 (9th Cir. 2000).

As plaintiffs have conceded the dismissal of their claims against Sheriff Gillespie, this claim now applies only to LVMPD. (ECF No. 33). Defendants have surmounted their initial burden under summary judgment by attacking plaintiffs' evidence and arguing that the alleged *de facto* policy is insufficiently pervasive to warrant *Monell* liability. (ECF No. 28); *see also Collins v. City of San Diego*, 841 F.2d 337, 341 (9th Cir. 1988) (discussing Supreme Court precedent

James C. Mahan
U.S. District Judge

- 8 -

1  regarding policymaking relevant to *Monell*).  Instead, they assert that plaintiffs' claims arise out

2  of this incident only.  (ECF No. 28).

3      Plaintiffs' opposition to this argument characterizes the relevant policy as a *de facto* one,

4  offering a series of facts addressing the officers' backgrounds and conduct of that day.  (ECF No.

5  33); *see also Christie*, 176 F.3d at 1235.  It is apparent that plaintiffs' opposition does not directly

6  address defendants' pervasiveness argument.  *See* (ECF No. 33).

7      More relevantly, however, plaintiffs have not presented a connection between facts or

8  submitted evidence indicating those facts are the result of a *final policymaking* authority, that

9  any kind of ratification had occurred, or how a *final policymaker* was "deliberate[ly] indifferen[t]

10  to [a] subordinate's constitutional violations."  *Christie*, 176 F.3d at 1235–41 (discussing ways

11  that *Monell* liability could be found based on a single incident).

12      Therefore, summary judgment in favor of LVMPD is warranted on this claim.  *See*

13  *Matsushita Elec. Indus. Co.*, 475 U.S. at 585–86.

14          *c.  State claims*

15            *1.  Discretionary immunity*

16      Nevada has waived its general state immunity under Nevada Revised Statute ("NRS") §

17  41.031.  The state's waiver of immunity is not absolute; the state has retained a "discretionary

18  function" form of immunity for officials exercising policy-related or discretionary acts.  *See* Nev.

19  Rev. Stat. § 41.032.[3]

20      In 2007, the Nevada Supreme Court adopted the United States Supreme Court's *Berkovitz-*

21  *Gaubert* two-part test regarding discretionary immunity.  *See Martinez v. Maruszczak*, 168 P.3d

22  720, 722, 728–29 (Nev. 2007).  Under Nevada law, state actors are entitled to discretionary-

23  function immunity under NRS § 41.032 if their decision "(1) involve[s] an element of individual

24  judgment or choice and (2) [is] based on considerations of social, economic, or political policy."

25  *Id.* at 729.  "[F]ederal courts applying the *Berkovitz-Gaubert* test must assess cases on their facts,

27     [3] NRS 41.032 states in relevant part that no action may be brought against a state officer

28  or official which is "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the State or any of its agencies or political subdivisions . . . whether or not the discretion involved is abused."  Nev. Rev. Stat. § 41.032(2).

1   keeping in mind Congress' purpose in enacting the exception: to prevent judicial second-guessing

2   of legislative and administrative decisions grounded in social, economic, and political policy

3   through the medium of an action in tort." *See id.* at 729 (quoting *United States v. S.A. Empresa de*

4   *Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)) (internal quotation marks

5   omitted).

6           Police officers "exercise[ ] discretion and [are] thus generally immune from suit where the

7   act at issue require[s] 'personal deliberation, decision, and judgment,' rather than 'obedience to

8   orders, or the performance of a duty in which the officer is left no choice of his own.'" *Sandoval*

9   *v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1168 (9th Cir. 2014) (citing *Davis v. City of Las*

10  *Vegas*, 478 F.3d 1048, 1059 (9th Cir. 2007)).  Further, "acts which violate the Constitution are not

11  discretionary." *Estate of Sauceda ex rel. Sauceda v. City of N. Las Vegas*, no. 2:11-cv-02116-

12  APG-NJK, 2015 WL 871611, at *9 (D. Nev. Mar. 2, 2015), *reconsideration denied sub nom.*

13  *Estate of Sauceda v. City of N. Las Vegas*, no. 2:11-cv-02116-GMN-NJK, 2015 WL 7737338 (D.

14  Nev. Dec. 1, 2015).

15          It is sufficient that defendants have failed to show here that they did not violate the

16  constitutional rights of plaintiffs, and evidence exists that plaintiffs' Fourth Amendment rights

17  may have been violated by an unreasonable seizure.  *See Garner*, 471 U.S. at 7; *see also* (ECF No.

18  28-1).  Therefore, the officer defendants are not entitled to discretionary immunity.  *See Nurse v.*

19  *United States*, 226 F.3d 996, 1002 (9th Cir. 2000) ("In general, governmental conduct cannot be

20  discretionary if it violates a legal mandate.").

21                                    *2.  Public duty doctrine*

22          NRS 41.0336 states that a "law enforcement agency is not liable for the negligent acts or

23  omissions of its firefighters or officers or any other persons called to assist it, nor are the individual

24  officers, employees or volunteers thereof, unless . . . The conduct of the firefighter, officer or other

25  person affirmatively caused the harm." Additionally, "[a]n officer affirmatively causes the harm

26  if he 'actively create[s] a situation which leads directly to the damaging result.'" *J.D.H. v. Las*

27  *Vegas Metro. Police Dep't*, No. 2:13-CV-01300-APG, 2015 WL 3657179, at *3 (D. Nev. June 12,

28  2015) (quoting *Coty v. Washoe Cnty.*, 839 P.2d 97, 99 (Nev. 1992) (noting that the Nevada

1   Supreme Court in *Coty* barred those "plaintiffs' negligence claims . . . even though the deputy

2   violated the sheriff department's internal procedures requiring the deputy to arrest drivers who fail

3   field sobriety tests because it declined to adopt a minority view that internal procedures, as opposed

4   to statutes or ordinances, could create a special duty.").

5   In their motion, defendants argue that "[t]he evidence shows that Torres, and not the

6   LVMPD defendants, were the active and direct cause of plaintiffs' injuries. Torres created the

7   entire situation by pulling and firing his weapon. The LVMPD defendants were only responding

8   to Torres' actions and were certainly not creating the situation." (ECF No. 28 at 24).

9   As before, defendants' offer a motion based on a version of the facts that the court at this

10  time cannot accept as true. So too here have they failed their burden on summary judgment. *See*

11  *Adickes*, 398 U.S. at 159–60.

12  *3. Negligence*

13  To prevail on a claim for negligence, a plaintiff must generally show that: "(1) the

14  defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; (3) the breach

15  was the legal cause of the plaintiff's injury; and (4) the plaintiff suffered damages." *Scialabba v.*

16  *Brandise Const. Co., Inc*., 921 P.2d 928, 930 (Nev. 1996). Under Nevada law, the questions of

17  proximate cause and reasonableness presented by a negligence claim usually advance questions of

18  fact for the jury. *Frances v. Plaza Pac. Equities*, 847 P.2d 722, 724 (Nev. 1993).

19  Most applicable here, defendants argue that plaintiffs' negligence claims fail because the

20  defendants utilized reasonable force in the incident as a result of Torres's violent response. (ECF

21  No. 28). Defendants' offered formulation of their duty to plaintiffs is based on this inapplicable

22  premise. *See* (*id.*) (considering police officers' duty to bystanders in the course of capturing a

23  dangerous suspect). Therefore, defendants again do not surmount their initial burden under

24  summary judgment, in light of the facts as the court must accept them for this motion.

25  *4. Assault and battery*

26  "The standard for common-law assault and battery by a police officer . . . mirrors the

27  federal civil rights law standard: Liability attaches at the point at which the level of force used by

28

**James C. Mahan**
**U.S. District Judge**

1   a peace officer exceeds that which is objectively reasonable under the circumstances." *Ramirez v.*
2   *City of Reno*, 925 F. Supp. 681, 691 (D. Nev. 1996) (collecting cases).

3         As before, there is a dispute of material fact as to whether defendants' actions were
4   "objectively reasonable" due to Landeros's testimony regarding the incident's chronology.[4]  *Id.*;
5   *see also* (ECF No. 28-1).

6         **IV.    Conclusion**

7         In sum, the court makes the following holdings: (1) Sheriff Gillespie is dismissed from the
8   action; (2) Villalba's § 1983 claim against Thomas is dismissed; (3) the remaining § 1983 claims
9   against the officer defendants withstand the present motion; (4) LVMPD is entitled to summary
10  judgment on plaintiffs' *Monell* claim; (5) plaintiffs' negligence claim remains active; (6) plaintiffs'
11  assault and battery claim is still active; and (8) Officer Villanueva is not entitled to a blanket
12  dismissal from the case.

13        Accordingly,

14        IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that defendants' motion for
15  summary judgment (ECF No. 28) be, and the same hereby is, GRANTED IN PART AND
16  DENIED IN PART, consistent with the foregoing.

17        DATED March 15, 2017.

18  _____
19  UNITED STATES DISTRICT JUDGE

26  [4] Defendants finally argue that "[i]t is undisputed that Ofc. Villanueva never fired or seized
    the plaintiffs. None of his actions allegedly harmed the plaintiffs. Thus, he must be dismissed."
27  (ECF No. 28 at 29).  However, the motion states that "Officers Parra and Villanueva approached
    Tones and began issuing verbal commands for all three individuals to put their hands up and get
28  on the ground."  (ECF No. 28 at 2).  Therefore, defendants concede that Villanueva was involved
    in the seizure of plaintiffs and Torres.  *See United States v. Faulkner*, 450 F.3d 466, 469 (9th Cir.
    2006).

James C. Mahan
U.S. District Judge

- 12 -